FILED
CLERK

1:22 pm, Dec 28, 2017

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MENGRU DAVIS,

                     Plaintiff,

         - against -

CHING YI CHENG, TERENCE CHENG,
HANG HSIN CHENG, WEI HSIN CHENG,
TAI HSIN CHENG and WEH-HSIN CHENG,

                 Defendants.

------------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
16-CV-1354 (ADS) (SIL)

**A P P E A R A N C E S:**

> **TROY LAW, PLLC**
> Attorneys for the Plaintiff
> 41-25 Kissena Blvd., Suite 119
> Flushing, New York  11355
> BY:   Kibum Byun, Esq., of Counsel
>
> **KEVIN KERVENG TUNG, P.C.**
> Attorneys for the Defendants
> 136-20 38th Avenue, Suite 3D
> Flushing, New York 11354
> BY:   Song Chen, Esq., of Counsel

**SPATT, District Judge.**

The plaintiff Mengru Davis (the "Plaintiff) commenced this lawsuit against the defendants Ching Yi Cheng (or "Ms. Cheng"), Terence Cheng, Hang Hsin Cheng, Wei Hsin Cheng, Tai Hsin Cheng and Weh-Hsin Cheng (together, the "Defendants"), for alleged violation of the Fair Labor Standards Act ("FLSA"), and the New York Labor Law ("NYLL"), arising from alleged unlawful employment policies and practices by the Defendants.  The gravamen of the complaint is that the Defendants failed to pay the

1

Plaintiff overtime compensation for hours worked in addition to forty hours per work week and for other violations of the applicable statutes.

Initially, the Court notes that in the title of this case, the Plaintiff has named as defendants Wei Hsin Cheng, Tai Hsin Chen and Weh-Hsin Cheng.  During the trial, one of the defendants called a witness Wei Hsin Cheng, a son of the defendant.  Even though neither party has referred to the person named three times in the title of the complaint as Wei Hsin Cheng, Tai Hsin Chen and Weh-Hsin Cheng, the Court infers that this is the same person and not three separate individuals.

The complaint requests recovery of: (1) unpaid minimum wages; (2) unpaid overtime wages; (3) unpaid spread of hours payments; (4) liquidated damages; (5) attorney's fees and costs; and (6) pre-judgment and post-judgment interest.

The case was tried before this Court on October 2, 2017, and was completed in one day.

This is the Court's decision rendered following the non-jury trial.

## I. <u>THE TESTIMONY</u>

### A. <u>The Plaintiff's Case</u>

The Plaintiff testified that she started to work for the defendant Ching Yi Cheng on December 5, 2013.  She worked for Ms. Cheng until February 8, 2016, a period of more than twenty-six months.  She typically worked from 5:00 p.m. at night to 8:00 a.m. the following day.  When asked what kind of work she did for Ms. Cheng, the Plaintiff testified that she heated food for her in addition to performing other duties for Ms. Cheng.

Ms. Cheng was living in a "kind of condo," which was her residence. When the Plaintiff first arrived at Ms. Cheng's residence at 5:00 p.m., her first duty was to "warm up the food." Then the Plaintiff would bring a bucket of hot water for Ms. Cheng "to place her feet in the water." (Tr. at 11). In her second year of employment, the Plaintiff would massage her feet by hand because Ms. Cheng had developed a red rash on her feet and could not use the water. The Plaintiff typically massaged Ms. Cheng's feet for about a half hour. Then either the Plaintiff or her son would take the defendant downstairs for her exercise. Asked to describe the exercise the defendant performed, the Plaintiff stood up and waved both her arms, "like the bird flying." (Tr. at 13). Her exercises extended for ten to twenty minutes.

After her exercise, Ms. Cheng would sometimes, chat with her friends. After the exercises, the Plaintiff would get the mail and then assist Ms. Cheng upstairs "to go back home." (Tr. at 14). When they were upstairs, the Plaintiff would turn on the television and the defendant would watch a Korean movie television series. They typically watched television from 9:00 p.m. to 11:00 p.m., a two hour period. At 11:00 p.m., when she finished watching television, Ms. Cheng washed her body by "rubbing her body", that took a period of a half hour to forty minutes. During this washing-up period, the Plaintiff rubbed Ms. Cheng's back. Then Ms. Cheng changed into her nightgown and, by 12:00 midnight was ready to go to sleep. After Ms. Cheng went to sleep, the Plaintiff also went to a bed and went to sleep. However, she was "also listening in case there was something happen to her." (Tr. at 17). The Plaintiff was listening to determine "if she was in any danger." (Tr. at 17). There was one occasion when Ms. Cheng got out of bed and sat down on the

floor and was unable to get up.  The Plaintiff assisted her to get up and she placed her back on the bed.

The Ms. Cheng slept in the master bedroom and the Plaintiff slept in the living room, which was next to the master bedroom.  She kept the door open between the master bedroom and the living room so that "in case she was in danger, if something happened to her."  (Tr. at 18).

The Plaintiff was aware of Ms. Cheng's medical condition and that she underwent heart surgery.  When Ms. Cheng would awaken at 7:00 a.m. in the morning, the Plaintiff massaged her stomach and also massaged her legs and feet.  The Plaintiff demonstrated how she conducted this massage by waving her hands in a circular manner.  The Plaintiff testified that she performed this massage on Ms. Cheng from 7:00 a.m. to 8:00 a.m., when she would leave work.

The Plaintiff further testified that she received money from Ms. Cheng while working for her.  She received $800.00 dollars per month for the first year and $900.00 dollars per month for the second year.  She was paid on the first day of each month by cash from Ms. Cheng.

While she was working for Ms. Cheng, no one recorded her activities.  Ms. Cheng "remembered it with her brain."  (Tr. at 21).  She received cash payments and no paper was given to her.  During the time the Plaintiff worked for Ms. Cheng, she saw no documents or paper of any kind with respect to her employment.

Although the Plaintiff testified during her direct examination that during the time she worked for Ms. Cheng, she resided at 140-10 Franklin Avenue in Flushing, New York,

4

the Court finds that the Plaintiff lived at Ms. Cheng's apartment during the course of her employment.   During cross-examination, the Plaintiff testified that she kept her clothes and shoes in Ms. Cheng's apartment, (Tr. at 29), had her own bed, (Id.), and that she leased the 140-10 Franklin Avenue apartment to her son-in-law.  (Tr. at 38-39).

The Plaintiff testified that she worked for Ms. Cheng seven days a week.   During the time that the Plaintiff worked for Ms. Cheng she saw the defendant's three sons every week or two.   On Sundays, she saw the defendant's number three son.   She could not name that son but saw him in the courtroom.   The son did not give her any "direction" while she worked for Ms. Cheng.   On one occasion, the number three son said to her that ". . . you are late for half an hour and I was afraid to leave.   If something happened to my mother, what should I do."  (Tr. at 24).

Once every year, the Plaintiff cleaned the windows for Ms. Cheng.

When the Plaintiff received her cash payments, they would be made by the defendant Ching Yi Cheng.

On cross-examination, the Plaintiff testified that her education consisted of her attending junior high school in China.   She did receive training as a home attendant five years ago in the United States for a period of one month in 2012.   She also learned "a little bit from the home healthcare company."  (Tr. at 28).   She has a home attendant license.

Ms. Cheng's apartment consisted of one bedroom and one living room located at 4265 Kissena Boulevard, Apartment 406, Flushing, New York.   During nighttime, Ms. Cheng slept in her bedroom and the Plaintiff slept in the living room.   The Plaintiff put her

clothes and shoes in the defendant's apartment.  There was a bed in the living room in which she slept.  The Plaintiff brought four cushions to the defendant's apartment.  The Plaintiff received $20.00 dollars to clean the windows with a tip of another $20.00 dollars for a total of $40.00 dollars.  Ms. Cheng also gave the Plaintiff $20.00 dollars for combing her hair.

The Plaintiff had worked for a company called ABI.  She started working for ABI seven years ago and left that job in 2014.  Her work schedule at ABI was sometimes four hours and sometimes six hours a day.  She worked for ABI sometimes in the morning and sometimes in the afternoon.  She worked from 11:00 a.m. to 3:00 p.m.  After 2014, she did not have any other daytime jobs.

It was Ms. Cheng who offered her the job and agreed to pay her $800.00 dollars per month and asked her to come to her apartment at 5:00 p.m. and leave at 8:00 a.m.  The defendant also had a domestic helper during the daytime.

Ms. Cheng went to dinner with her eldest son two times a week.  When Ms. Cheng went to dinner with her son, the Plaintiff went to her son-in-law's small apartment at 140-10 Franklin Avenue, Flushing, New York, to take a rest.  This apartment was one block away from the defendant's residence.  The Plaintiff's husband's name is Xia Qun Gao.  She received the name Davis when she applied for citizenship and she changed her name to Davis. She loves that name.

Sometimes when Ms. Cheng was watching television, the Plaintiff went to bed and was awakened by Ms. Cheng.

Ms. Cheng can dress herself and she groomed herself.  The Plaintiff would massage her head and her hair.  For one month, the Plaintiff massaged the defendant's head every day.  Ms. Cheng did not need anyone to feed her.  However, she heated up food for the defendant every day.

The Plaintiff stated that the defendant had three children.  She never met the defendant's daughter.

On redirect examination, the Plaintiff testified that she had worked as a home aid attendant for other persons.  Ms. Cheng did not use a wheelchair when she went to dinner with her children.  However, she did use a wheelchair at other times.  After dinner with Ms. Cheng, the Plaintiff washed the dishes and the chopsticks, every day.  Even though Ms. Cheng went to dinner with her son, she would always first eat at home, seven days a week because the rice in the food at the restaurant was not very clean and caused her discomfort.  The Plaintiff washed the dishes and chopsticks for Ms. Cheng every day during the time she worked for her.  After she finished her work at 8:00 a.m., another home attendant would arrive at 9:00 a.m.

On re-cross examination, that Plaintiff testified that she washed dishes for the defendant every day.  Also, the defendant's youngest son, Wei Hsin Cheng would take his mother out to dinner as well.  When the defendant went to dinner with her sons, the Plaintiff waited for her in the park.

The defendant Ching Yi Cheng was called to the stand as a witness in the Plaintiff's case.  The defendant testified, that the Plaintiff worked for her approximately two years.  She has no records which would show the days of the Plaintiff's employment with her.

7

The Plaintiff worked for her from 5:00 pm until sometime after 7:00 in the morning.  Again, the defendant stated that she has no written documents or papers with regard to the Plaintiff's work schedule.  As to compensation, the defendant stated that "she asked for $800." (Tr. at 55).  They never discussed overtime.

The defendant testified that in Court with her was her home attendant, who works from 8:00 a.m. to 5:00 p.m. and is paid by the government.  The defendant had a nighttime shift for her home aid, namely, the Plaintiff.  The defendant testified that "she work night shift and she accompany me to sleep." (Tr. at 56).  The defendant had one home aid attendant during the day, and she also had the Plaintiff for the night shift between 5:00 p.m. and 7:00 a.m.

Asked why she needed a nighttime home aid, the defendant responded: "She would accompany me to sleep because I was afraid.  I was afraid to be living by myself at night . . . I was afraid that I would fall again because I also have fallen several times . . . . I also have a pace maker and because of my heart problem I would die at any time." (Tr. at 57).

Also, the defendant testified that the Plaintiff, as her home attendant, did cleaning work at her home on Saturday and Sunday for two months.

The defendant received close to $400.00 dollars per month for her retirement fund.  At first, she paid the defendant $800.00 dollars per month and later on she paid her $900.00 dollars per month.  Her four or five children gave her money.  Each child gave her $300.00 dollars, and in addition, she has food stamps so that she can purchase food.

8

The defendant hired the Plaintiff because her sons were busy and she was afraid to live by herself.  She was scared and could not go to sleep.  Her children were afraid that she would fall again.  Her children gave her money, "but they didn't care how she spent it."  (Tr. at 66).  Her sons took her out for dinner more than twice a week.  Her youngest son, Wei Hsin Cheng, took her out almost every night.

The defendant has a bank account in the United States at China Trust.  She didn't know if it was a joint account with one of her children.  Her son, Terrence Cheng, purchased the house in which she resides.

On cross-examination by her counsel, the defendant testified that she came to the United States at the age of seventy-three and now she is eighty-seven years of age.  She herself made the decision to hire the Plaintiff when the Plaintiff approached her.  Her hours started at 5:00 p.m. including Saturday and Sunday.

Wei Hsin Cheng, a son of the defendant, called by the Plaintiff, testified that he has seen the Plaintiff at his mother's residence and that "she accompanied my mother to sleep."  (Tr. at 71).  He also testified at a deposition that "she was the one who help my mom out of the building."  (Tr. at 74).  He saw the Plaintiff when he waited for his mother downstairs, from Monday through Thursday.  When he went to his mother's house to pick her up for dinner, the Plaintiff was downstairs "to assist my mother into the vehicle."  (Tr. at 74, 75).  He has a joint bank account with his mother at the China Trust.  He never gave any money to his mother while the Plaintiff was working for her.  He did give money to his mother on her birthday and New Years Day.

9

Hang Hsin Cheng, another son of the defendant, also called by the Plaintiff, testified that he saw the Plaintiff sleeping on the bed in his mother's house.  He knew that she was the butler for his mother.   Asked to explain, he stated that the Plaintiff accompanies his mother to sleep at night.  He would give his mother $200.00 or $300.00 dollars every year on New Years Day; and on her birthday and holidays, "just to show my love to my mother." (Tr. at 78).

The Plaintiff was then recalled by her counsel.  While she worked for Ms. Ching Yi Cheng she did not perform cleaning services of her house.  She just washed the dishes and warmed up the meals.  In testimony, somewhat confusing to the Court, the Plaintiff testified that she worked for the government on Saturdays and Sundays for two months from 9:00 a.m. to 3:00 p.m., for six hours.  Asked what government hired her to do that, the Plaintiff responded "the home attendant company."  (Tr. at 80).  During that period she was paid by checks.  Also, during that period the Plaintiff washed clothes for the defendant; cleaned her sofa; bought groceries and went to the pharmacy to pickup medication for the defendant.  During that two month period, the Plaintiff also had her nighttime job at the defendant's home.

During a two month period, she worked for the defendant from 9:00 a.m. to 3:00 p.m. on Saturdays and Sundays, and the Plaintiff did whatever the defendant told her to do, "that was a must."  (Tr. at 82).  Also, the Plaintiff performed various tasks such as cleaning the sofas; picking up letters; picking up medications; all as directed by the defendant.  The Plaintiff also massaged the defendant and washed the dishes.

10

On cross-examination, the Plaintiff testified that she went to the grocery store with the defendant using her wheelchair and she placed the grocery bags on both sides of the wheelchair.  She purchased tuna, meat, white turnip and tomato for the defendant.  The Plaintiff did this very rarely, maybe once a week.  The Plaintiff also went to the pharmacy to pick up medications for the defendant.  The people at the pharmacy all knew her. Whenever the defendant was prescribed medications, she would pick them up.  This was apparently twice a month.

The Plaintiff then rested.  The defendants' motion to dismiss at the end of the Plaintiff's case was DENIED.

## B. <u>The Defendants' Case</u>

Ching Yi Cheng, the defendant (herself) was called again as a witness.  She testified that she came to the United States at age seventy-three and that she is eighty-eight years of age.  Asked about her health, the defendant testified that she was sick and suffered from heart problems and hypertension.  She lives at 4265 Kissena Boulevard, Apartment 406, Flushing, New York.  The apartment consists of one bedroom and one living room.  During the years from 2013 to 2015, her home attendant resided with her. A company provided a home attendant for her during the daytime hours.  That attendant was paid for by the government.  She also had a nighttime home attendant who she paid for by herself.  The daytime home attendant "did everything, all the house chores," (Tr. At 89); including washing her underwear; preparing meals; and sweeping the floor.  The daytime home attendant also bought groceries and picked up medication for her.

When the Plaintiff first worked for the defendant she was to be her companion and spend the night with her.  The Plaintiff asked for $800.00 per month as compensation. The Plaintiff then asked to raise her compensation to $900.00 dollars per month.  Also, the Plaintiff charged her $20.00 dollars for trimming her hair and $40.00 dollars for cleaning the windows in the apartment, which she did once a year.

Also, the Plaintiff had someone replace her when her daughter gave birth, only for one or two days.  The defendant knew that the Plaintiff had a daytime job as a "home attendant" "to help an old lady to take a shower."  (Tr. at 95).  At one time, the defendant's children had dinner with her almost every day.  Now it occurs less frequently.  She had dinner with her sons from 7:00 p.m. until 9:30 p.m. and the latest to 10:00 p.m.  During that time, the Plaintiff went home but she came back in time to accompany the defendant back upstairs to her apartment.

The defendant testified that she had a "major" shower every five days and she cleaned herself, and a "minor" shower every day, when she cleaned herself with a towel. She took a shower by herself.  She also cleaned her toilet by herself and dressed and undressed herself.  In the morning, the Plaintiff got up by 7:30 a.m., the latest, and left for work.  The Plaintiff massaged her stomach "once every several days."  (Tr. at 99).  Also, the Plaintiff only rarely washed dishes for her.  The Plaintiff kept her coats, a quilt, several pillows and a tea pot in the defendant's home.  The Plaintiff ate her food in the defendant's home.  "She used my residence as her home."  (Tr. at 100).  During the night, the defendant did not wake up and call for the Plaintiff's assistance.

12

The defendant has four sons and a daughter who is in Paris and did not come to the apartment to meet the Plaintiff while she was working for the defendant.

On cross-examination, the defendant testified that when the Plaintiff was working for her, she almost always went out to dinner with her sons.  However, in her deposition, she testified that her son took her out to dinner on Monday to Wednesday.  On Thursday to Sunday, her home health aide cooked for her.

In the midst of her cross-examination, the defendant abruptly stood up, left the witness stand and left the courtroom.  After a ten minute recess, the Court reconvened and defendant's counsel asked for another recess.  Her counsel stated that the defendant felt weak and dizzy.  The Court gave counsel for the defendant the opportunity to bring the defendant back the next day.  That offer was declined and the defendant returned to the witness stand about twenty-five minutes after she initially left the stand in the midst of cross-examination.

Proceeding with the cross-examination, the defendant testified that she had to go to the bathroom and "could not withhold any more."  (Tr. at 111).

Although the defendant testified that she left her home "very often," in her deposition she testified that "I don't go out often."  (Tr. at 112).

The Plaintiff left the defendant's home in the morning between 7:30 a.m. and 8:00 a.m.  In her deposition, the defendant testified that "her set time was eight."  (Tr. at 114).

The defendant paid the Plaintiff $800.00 dollars per month the first year and $900.00 dollars per month the next year.  The defendant did not know what was the minimum wage and she didn't know about overtime.  When the Plaintiff trimmed her hair,

13

she asked the defendant for some extra money.  This occurred only once or twice.  While the Plaintiff's daughter was giving birth someone else came to her house to assist her.  She doesn't recall how many days that happened.

Wei Hsin Cheng, another son of the defendant, who also went by the name of Vincent, also testified.  He is a named defendant in this case.  He knew very little about the working relationship between the Plaintiff and the defendant and the Plaintiff's compensation.  In 2014 and 2015, he took his mother out to dinner on Monday, Tuesday and Wednesday at 7:00 p.m. and brought her back to her apartment after dinner between 9:30 p.m. and 10:00 p.m.  His older brother Terence Cheng also took their mother out to dinner, sometimes on Thursday, Friday, Saturday and Sunday.  There was no cross-examination of this witness.

Hang Hsin Cheng, also known as Henry, another son of the defendant, did not know the Plaintiff.  On Sundays when he visited his mother, he saw someone sleeping, but he was not sure if it was the Plaintiff.  He was not involved in the hiring or firing of the Plaintiff.  He didn't know there was a "firing."  He also did not know about the Plaintiff's rate of compensation.  On cross-examination, he testified that he never took his mother out for dinner and he visited her on Sunday afternoons between 1:00 p.m. and 3:00 p.m.

Both sides rested.

When asked by the Court as to the theory of liability against the defendant's children who are named as co-defendants, the Plaintiff responded that "those other dependents who is children should be joint liable as joint employer under the law . . . and they were the ones who funded Ms. Ching Yi Cheng to pay for Ms. Davis' salary."  (Tr. at

14

125).  The Plaintiff's counsel also stated the following as to his theory of the liability of the

defendant's sons:

> MR. BYUN:   There was testimony where the youngest son was calling plaintiff to
> get ready when they would come from the dinner, your Honor.  Also
> there was one testimony from plaintiff that the youngest son made a
> comment on her being late.  That's the evidence that we have at this
> moment, your Honor.

(Tr. at 126).

## II.  DISCUSSION

### A.  As to the Liability of the Defendant Children of the Ms. Cheng

Here, the proof is clear and unequivocal that the Plaintiff was hired, retained and

paid by the defendant Ching Yi Cheng.  The Plaintiff worked for only that defendant; the

mother of the co-defendants.  There is absolutely no evidence that any of the other co-

defendants; namely, Ms. Cheng's children, had anything to do with the Plaintiff's

employment.  Although the FLSA specifically contemplates joint employer liability, there

is no information that lends the Court to believe that there is such liability here.  *See* 29

C.F.R. § 791.2(a); Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 141

(2d Cir. 2008).  To determine whether multiple defendants qualify as a plaintiff's joint

employers, the Court must assess "the 'economic reality' of [the] particular employment

situation." *Barfield*, 537 F.3d at 142.  The Second Circuit identified a number of relevant,

nonexclusive factors in making such a determination, Zheng v. Liberty Apparel Company.

355 F.3d 61, 71-72 (2d Cir. 2003); *see also* DE 46 (Plaintiff noting in her post-trial brief

that "courts in this District regularly apply the same tests to determine whether entities

15

were joint employer under NYLL and the FLSA").  None of these factors are present in the instant case.

As counsel for the Defendants correctly enunciated at the close of the case, there is nothing in this record to indicate in any manner that these children of the defendant Ching Yi Cheng either interviewed or hired the Plaintiff.  Stated simply, they had nothing to do with the hiring, employment or wages of the Plaintiff.

Accordingly, the defendants' motion to dismiss this case in all respects against the defendants Terence Cheng, Hang Hsin Cheng, Wei Hsin Cheng and Tai Hsin Cheng is GRANTED.

**B.  Did the Defendant Ms. Cheng Validly Plead or Assert the Defense that the Plaintiff is Exempt under the FLSA and NYLL?**

In the defendants' Post-Trial Memorandum of Law, they raise the important issue of exemption from the terms of the FLSA and the NYLL.  The defendants assert that the "companionship service" exemption in the provisions of the FLSA and NYLL applies to the Plaintiff and, therefore, she may not recover under those statutes.  In response, the Plaintiff, in her Post-Trial Reply Memorandum of Law asserts that the defendants failed to plead or assert the "affirmative defense" that the Plaintiff is exempt under the FLSA and the NYLL.

Initially, the Court finds that the Plaintiff must prove, by a preponderance of the evidence, that she is entitled to recover under the provisions of the FLSA and the NYLL. In this burden of proof, it is the Court's view that the Plaintiff must prove she is entitled to recover under the statutes.  Moon v. Kwon, 248 F. Supp. 2d 201, 238 (S.D.N.Y. 2002).

16

The Defendants must bear the same burden with respect to any affirmative defenses they assert.  See Wechsler v. Hunt Health Sys., Ltd., 330 F. Supp. 2d 383, 403 (S.D.N.Y. 2004).

In the Court's view, the Defendants have successfully alleged the affirmative defenses at issue prior to trial.  A review of their answer reveals the following:

"Sixth Separate Defense – 75.  Plaintiff was not "covered" employee under the Federal Labor Standards Act."

"Sixteenth Separate Defense – 85.  The Court lacks subject matter jurisdiction over some or all of claims made by Plaintiff when such claims are banned by Federal Labor Standards Act and/or New York Labor Law."

"Seventeenth Separate Defense – 86.  Defendants are exempted from wage claims under Federal Labor Standards Act and/or New York Labor Law."

Therefore, the Court will review the rules of law involving the alleged exemption of the defendant Ching Yi Cheng under the provisions of the FLSA and the NYLL.

## C.  <u>The FLSA and Domestic Workers</u>

In 1974, Congress amended the FLSA to extend minimum wage and overtime protection to domestic workers.  Fair Labor Standards Act of 1974, Publ. L. No. 93-259, § 7, 88 Stat. 55, 62 (1974).  In that amendment, Congress determined that "a living wage and respectable working conditions were vital" to developing "an effective and dignified domestic workforce."  S. Rep. No. 93-690 at 19-20.  The statute applies to domestic workers who are "employed in domestic service in one or more households" and "either (1) receives sufficient compensation per calendar year such that his compensation would

17

constitute wages under the Social Security Act or (2) provides the domestic services for more than eight hours per week." 29 U.S.C. § 206(f).

The statute reads as follows:

(f) Employees in domestic service

Any employee –

(1)  who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the wage rate in effect under subsection (b) of this section unless such employee's compensation for such service would not because of section 209(a)(6) of the Social Security Act [42 U.S.C.A. § 409(a)(6)] constitute wages for the purposes of title II of such Act [42 U.S.C.A. § 401 et seq.], or

(2)  who in any workweek –

(A)  is employed in domestic service in one or more household, and

(B)  is so employed for more than 8 hours in the aggregate,

shall be paid wages for such employment in such workweek at a rate not less than the wage rate in effect under subsection (b) of this section.

Also, 29 U.S.C. § 207 subdivision L, provides for compensation for a person employed in domestic service, as follows:

(l)  Employment in domestic service in one or more households

No employer shall employ any employee in domestic service in one or more households for a workweek longer than forty hours unless such employee receives compensation for such employment in accordance with subsection (a) of this section.

18

In addition, the Department of Labor has issued regulations which defines the statutory terms "domestic service employment" as "service of household nature," including cooking, caretaking, personal care or aiding, on a more than casual basis.

The term "domestic service employment" was defined in 29 C.F.R. § 522.3 effective January 1, 2015, as follows:

> The term domestic service means services of a household nature performed by an employee in or about a private home (permanent or temporary).  The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use.  The listing is illustrative and not exhaustive.

## D.  As to the Claimed "Companionship" Exemption From the Provisions of the FLSA

Initially, the Court determines that the employer invoking an exemption defense bears the burden of proving that its situation falls within the provisions of this exemption. Reisch v. Universal, 591 F. 3d 101, 104 (2d Cir. 2010) and, to the New York Labor Law, 12 N.Y.R. RR § 142-2.2 (adopting the FLSA exemptions).

The defendant contends that the "companionship services" exemption to the FLSA applies in this case.  The applicable provision of 29 U.S.C. § 213(a)(15), reads as follows:

> § 213.  Exemptions
>
> (a)  Minimum wage and maximum hour requirements
>
>   The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to —
>
>   *    *    *    *    *

19

(15)  any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary).

As set forth in the definitive case of <u>Bonn-Wittingham v. Project O.H.R. (Office of Homecare Referral, Inc.</u>, No. 16-cv-541, 2016 U.S. Dist. LEXIS 172767 at 8-9 (E.D.N.Y. Dec. 14, 2016), "This exemption provides that the requirements of the FLSA do not apply to 'any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves.'" 29 U.S.C. § 213(a)(15).

The regulations that were in effect as of January 1, 2015, 29 C.F.R. § 552.6 provide as follows:

(a)  As used in section 13(a)(15) of the Act, the term companionship services means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself.  The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversations, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events.  The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.

(b)  The term companionship services also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek.  The provision of care means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live

20

independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

(c)  The term companionship services does not include domestic services performed primarily for the benefit of other members of the household.

(d)  The term companionship services does not include the performance of medically related services provided for the person.  The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services.

This regulation was effective as of January 1, 2015. De Carrasco v. Life Care Servs. Inc., No. 17-cv-5617, 2017 WL 6403521, at *3-4 (S.D.N.Y. Dec. 15, 2017) (collecting cases that hold the Department of Labor's October 2013 regulations "had an effective date of January 1, 2015").  Prior to this regulation, the regulation in force during the period from December 5, 2013 to January 1, 2015, defined "companionship services" as "fellowship care and protection" including household work related to the care of the aged or infirm person . . . (or) performances of general household work:  provided, however, that such work is included; i.e. does not exceed twenty percent of the total weekly hours worked." 29 C.F.R. § 552.6 (effective until January 1, 2015).

As stated in Bonn-Wittingham, the Department of Labor further defined "personal care" of the patient and "general household" work in a March 15, 1995 Opinion Letter, which stated:

[I]t is our opinion that such activities as cleaning the patient's bedroom, bathroom or kitchen,  picking up groceries, medicine, and dry cleaning would be related to personal care of the patient" which would be "the type of household work that would be exempt work."  See U.S. Dep't of Labor,

Opinion Letter on Fair Labor Standards Act (March 16, 1995), 1995 WL 1032475, at *1 ("DOL Letter").  The letter continues:  "However, activities involving heavy cleaning such as cleaning refrigerators, ovens, trash or garbage removal and cleaning the rest of a 'trashy' house would be general household work or nonexempt work that is subject to 20 percent time limitation.

Id.

As stated in Bonn-Wittingham, under the new regulations effective January 1, 2015, "only fellowship and protection" service are exempt from FLSA protection, 29 C.F.R. § 552.6.  However, the "provision of care" to elderly or infirm persons, such as assistance with the activities of daily living, meal preparation and light household work is exempt from the FLSA only if 'provider attendant to and in conjunction with the provisions of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person per weekend.'" (Bonn-Wittingham at 3).

The Court in Bonn-Wittingham noted that the current regulations from January 1, 2015 also excludes light household work from the companionship exemption; and, therefore, the new regulation would exempt fewer persons than the provisions regulation. "Therefore any complaint that adequately pleads the inapplicability of the companionship exemption under the old regulations meet the requirements of the new regulations as well." (Bonn-Wittingham at *3).

(1)    Prior to January 1, 2015

Prior to January 1, 2015, the "companionship" exemption to the provision of the FLSA applied to anyone employed in domestic service employment who provides

companionship for persons who, because of infirmity or age were unable to care for themselves.  The exemption at issue is set forth in 29 U.S.C. § 213(a)(15), as follows:

§ 213.  <u>Exemptions</u>

The provisions of section 206 . . . and section 207 of this title shall not apply with respect to —

\*   \*   \*   \*   \*   \*

(15)  any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves . . ..

Until January 1, 2015, the "companionship services" are defined as "'fellowship care and protection' including 'household work related to the care of the aged and infirm person . . . (or) performance of general household work: provided, however; that such work is incidental; i.e. does not exceed twenty percent of the total weekly hours worked." 29 C.F.R. § 552.6 (effective until January 1, 2015).

The Court finds that the Plaintiff did some general household work, namely; getting the mail; cleaning the windows once every year; washing the dishes and chopsticks.  Also, during a two month period she washed clothes, cleaned the sofa and went to the pharmacy to pick up medication for the defendant.  Many of these tasks were specifically designated as exempt companionship services in 29 C.F.R. § 552.6. However, all of the Plaintiff's work constituted household work related to the care of Ms. Cheng, and therefore exempt work, as per the above-mentioned Department of Labor 1995 opinion letter, for FLSA purposes.  <u>See </u>Torres v. Comm'r of Soc. Sec.<u>, No. 13-cv-330, 2014 WL 69869, at *1 (E.D.N.Y. Jan. 9, 2014)</u>.

23

(2)     Subsequent to January 1, 2015

Under the new regulations effective January 1, 2015, as set forth in 29 C.F.R. §

552.6 "companionship services" are defined as follows:

(a)   As used in section 13(a)(15) of the Act, the term companionship services means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself.  The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events.  The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.

(b)  The term companionship services also includes the provision of care if the care is provided attendant and in conjunction with the provision of fellowship and protection and if it does not exceed twenty percent of the total hours worked per person and per workweek.  The provision of care means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

(c)    The term companionship services does not include domestic services performed primarily for the benefit of other members of the household.

(d)  The term companionship services does not include the performance of medically related services provided for the person.  The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services.

In this case, as set forth above and to be restated, the companionship work of the Plaintiff Mengru Davis for the defendant Ms. Cheng constituted "companionship services" within the exemption provision of the FLSA.

Relating the facts of this case to the relevant provisions of the FLSA and the provisions of the Code of Federal Regulations, the Court finds the following facts were established in the evidence:

The Plaintiff acted as a companion to the defendant Ching Yi Cheng.  She stayed at the apartment owned by Ms. Cheng from December 5, 2013 to February 8, 2016, from the hours of 5:00 p.m. at night to 8:00 a.m. in the morning.  The Plaintiff slept at the defendant's house and was there personally because she could "accompany me to sleep."  The Court finds that any other work or tasks done by the Plaintiff at the defendant's home were purely auxiliary to her main mission, to keep the defendant company at night, while she slept.  All of the other tasks done by the Plaintiff were purely part time, and mainly to assist the defendant in getting her to sleep.  Certainly, such tasks, even if some were determined to be a "provision of care" within the statute, were far less than "twenty percent of the total hours worked . . . per work week."

Therefore, the Court finds that the Plaintiff worked for the defendant as a "companion" and her position was within the term of "exemption" within the provisions of the FLSA; and was not covered by the FLSA during her entire term of employment. Accordingly, the FLSA claims by the Plaintiff against the defendant Ching Yi Cheng are DISMISSED.

**E.  As to the Plaintiff's Claim Under the Provisions of the New York Labor Law**

Under the provisions of the New York Labor Law Section 2, entitled "Definitions,"

the term "Domestic Worker" is defined, as follows:

"Domestic worker" shall mean a person employed in a home or residence for the purpose of caring for a child, serving as a companion for a sick, convalescing or elderly person, housekeeping, or for any other domestic service purpose.  "Domestic worker" does not include any individual (a) working on a casual basis, (b) who is engaged in providing companionship services, as defined in paragraph fifteen of subdivision (a) of section 213 of the fair labor standards act of 1938, and who is employed by an employer or agency other than the family or household using his or her service, or (c) who is a relative through blood, marriage or adoption of: (1) the employer; or (2) the person for whom the worker is delivering services under a program funded or administered by federal, state or local government.

Further, under the provisions of the New York Code of Regulations, an "employee"

does not include any individual permitted to work as a "companion."  The applicable Rule

provides the following:

(c)  Employee also does not include any individual permitted to work in, or as:

(1)  Baby-sitter; companion.

(i)   The term baby-sitter means an individual in service as a part-time baby-sitter in the home of the employer.

(ii)  The term companion means someone who lives in the home of an employer for the purpose of serving as a companion to a sick, convalescing or elderly person, and whose principal duties do not include housekeeping.

The New York State Rule was earlier further defined by the Appellate Division,

Second Department in the case of <u>In the Matter of Settlement HomeCare Inc. v. Industrial</u>

Board of Appeals of the Dept. of Labor of the State of New York, 151 AD2d 580, 542 N.Y.S.2d 346 (2d Dept. 1989).  The Court held that the "home attendant" exemption from coverage under the New York Labor Law extended to sleep-in home attendants, provided that his or her principal duties do not include housekeeping.  In the Matter of Settlement, the Court determined that while the home attendants did provide "some measure of companionship," the evidence overwhelmingly supported the Board's conclusion that the companionship was "incidental" to rather than the purpose of the attendants' presence in clients' homes.

Here, the Court finds that the Plaintiff's position as a sleep-in home attendant was overwhelmingly the main purpose of her presence in the defendant's home.  The very rare housekeeping services were only slightly instrumental to the defendant's main purpose – companionship to Ms. Cheng.

In the Matter of Settlement, the Court considered the term "companion" as defined in the Division of Labor Standards as follows:

"Someone who lives in the home of an employer for the purpose of serving as a companion to a sick, convalescing or elderly person, and whose principal duties do not include housekeeping."

Here, there was overwhelming evidence that the Plaintiff, Mengru Davis, lived in the home of the defendant, her employer for the sole purpose of serving as a companion to this elderly person.  See In the Matter of Settlement, 151 AD2d at 580.  As such, the Plaintiff is clearly within the exemption under the provisions of the New York Labor Law.

A case which illustrates the role of a "home attendant" outside the bounds of the exemption is Andryeyeva v. New York Health Care, Inc., 45 Misc. 2d 820, 994 N.Y.S. 2d 278 (Sup. Ct. Kings Co. 2014), affirmed, 153 A.D. 3d 1216, 61 N.Y.S. 2d 280 (2d Dep't 2017).  In this case, the home attendants were employed by the defendants to provide services to homebound, elderly and disabled clients.  However, such duties also included the following services:

> Plaintiffs' duties included: personal care services, such as assistance with walking, bathing, dressing, personal grooming, meal preparation, feeding and toileting; heavy and light cleaning, such as vacuuming, mopping, dusting, cleaning windows, cleaning bathrooms, doing laundry and taking out garbage; shopping; running errands; and escorting clients. Plaintiff worked a number of 24-hour periods.

In this case, most of the Plaintiff's time was as a "companion," to sleep at the defendant's house every evening as a companion because she was afraid to be alone. The other duties performed of the Plaintiff were of a minor nature and required very little time, certainly less than twenty percent of her working time.

## F.  Conclusions as to Liability

The Court finds that the defendant Ching Yi Cheng has established, by a preponderance of the credible evidence, that the Plaintiff Mengru Davis was a "companion" and a domestic worker who performed "companionship services" during the entire duration of her employment with the defendant.

Further, the Court finds that any other services of a household nature, performed by the Plaintiff, were substantially less than twenty percent of the total weekly hours worked.

28

Accordingly, the defendant is entitled to the dual exemptions under both the Fair Labor Standards Act and the New York Labor Law.  Therefore, all the causes of action brought by the Plaintiff in the complaint are DISMISSED.

**G.  As to Attorney's Fees and Costs**

In their answer, in the Joint Pre Trial Order and in their Post Trial Memorandum of Law, the defendants' request not only a judgment dismissing Plaintiff's complaint in its entirety, but also, if successful, an award of reasonable attorney's fees and costs and disbursements.

The issue is therefore directly raised: is a successful defendant-litigant in an FLSA-NYLL case entitled to attorney's fees?  The statutes involved both contain provisions involving attorney's fees.

As to the FLSA, 29 U.S.C. § 216(b) states that "The Court in such actions, shall, in addition to any judgment awarded to the Plaintiff or Plaintiffs, allow a reasonable attorney's fees to be paid by the defendant and costs of the action."  New York Labor Law § 663(1) states that "(an employee) may recover costs and such reasonable attorney's fees as may be allowed by the Court."

There are no similar provisions in the FLSA or the NYLL for the payment of attorney's fees and costs to a prevailing defendant.  The applicable statutes do not provide for attorney's fees for a successful defendant in a FLSA or NYLL cause of action.

Further, the defendants cite no authority for their request for attorney's fees.

In two cases, decided years ago, it appears that attorney's fees are not available to a successful defendant in a FLSA-NYLL cause of action.  In San Antonio Metropolitan

29

Transit Authority v. McLaughlin, 684 F. Supp. 158 (W.D. Texas 1988), the Court used the relevant provision of the FLSA as to attorney's fees in favor of a prevailing Plaintiff and also held:

> The statute is clear.  Plaintiffs who recover a judgment under §§ 206, 207, or 215(a)(3) of the FLSA shall be awarded attorney's fees and costs.  Id.; United Slate Tile and Composition Roofers v. G. & M. Roofing and Sheet Metal Company, 732 F.2d 495, 501 (6th Cir. 1984); Burnley v. Short, 730 F.2d 136, 141 (4th Cir. 1984).

> \*   \*   \*   \*   \*

> C.  The Plain Language of FLSA Prevents Recovery of Attorney's Fees and Costs by Defendant-Intervenor

> \*   \*   \*   \*   \*

> The statute at issue in this case, 29 U.S.C. § 216(b), is clear.  Plaintiffs are entitled to their attorney's fees and costs when they recover from an employer who has been found to have violated §§ 206, 207, or 215(a)(3) of the FLSA. Defendant-Intervenor was not a plaintiff in this case. Defendant-Intervenor had no recovery from his employer in this case.  Defendant-Intervenor thus does not come within the ambit of § 216(b) and is not entitled to his attorney's fees and costs pursuant to that provision.

An interesting discussion of this rule was set forth in Kreager v. Solomon & Flanagan, 775 F.2d 1541 (11th Cir. 1985).  The plaintiff in Kreager filed an action under the FLSA, and also another count involving fraud.  Both counts were ultimately dismissed by the District Court.  However, the District Court granted the successful defendant attorney's fees and costs.  On appeal, the Circuit Court recited the familiar rule that the applicable statute, Section 216(b) makes fees mandatory for prevailing plaintiffs.  The Court ruled:

> Section 216(b) of the Act makes fee awards mandatory for prevailing plaintiffs.  See Christianburg Garment Co. v. EEOC, 434 U.S. 412, 416 & n. 5, 98 S.Ct. 694, 697 & n. 5, 54 L.Ed.2d 648.  Unlike other legislation *1543 which authorizes fee awards to prevailing parties, the Fair Labor Standards Act does not specifically provide attorney's fees to prevailing defendants.  We must therefore look beyond the Act for an exception to the American Rule.

However, in Kreager, there was a claim by the defendant that the plaintiff acted in bad faith in bringing this litigation.  Therefore, the Appellate Court ruled that there should be an evidentiary hearing with regard to the bad faith element leading to the award of attorney's fees.  In that regard, the Court referred to the Title VII Thirteen factors involved in that kind of case.  However, as stated, that case involved "bad faith litigation" commenced under the Fair Labor Standards Act.

Other cases have confirmed the principle that a successful Fair Labor Standards Act defendant; usually is not entitled to attorney's fees.  As such, the Court declines to award the Defendants attorney's fees or other cost

### III. <u>CONCLUSIONS</u>

The Plaintiff's complaint is dismissed it its entirety; judgment is rendered in favor of the defendants dismissing the complaint.

The defendants' request for attorney's fees and costs is denied.

The Clerk of the Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:  Central Islip, New York
        December 28, 2017


                                    ___/s/ Arthur D. Spatt_____
                                    ARTHUR D. SPATT
                                    United States District Judge